**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

THE MODERN SPORTSMAN, LLC, *ET AL.*,

         Plaintiffs,

   v.

THE UNITED STATES,

         Defendant.

Case No.: 1:19-cv-449

Judge Loren A. Smith

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

Plaintiffs, The Modern Sportsman, LLC, *et al.*, ("**Plaintiffs**"), by and through their undersigned counsel, hereby files their Response in Opposition to The United States of America's Motion to Dismiss.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... ii

INTRODUCTION...................................................................... 1

ISSUE PRESENTED.................................................................. 3

STATEMENT OF THE CASE.................................................…..... 3

ARGUMENT.................................................................................. 6

I. The Government's Final Rule requiring surrender or destruction of lawfully acquired bump-stocks was a *per se* physical taking......................................... 6

    A. The Government's "police powers" do not excuse payment of just compensation for a categorical physically taking.................................. 8

    B. Bump-stocks were neither "property that is subject to a statutory prohibition" nor "property that may be subject to a statutory prohibition" within the meaning of Takings jurisprudence.................. 12

        1. Bump-stocks were not statutorily prohibited property when the Final Rule took them....................................... 13

        2. The possibility that tangible private property "may" be subject to a statutory prohibition does not preclude a compensable takings claim.......................................... 17

    C. Federal district court decisions on state laws banning the possession of bump-stocks do not determine the validity of Plaintiffs' claims............. 20

    D. A ruling upholding Plaintiffs' Fifth Amendment right to just compensation will not unleash the Government's threatened parade of horribles.................................................................................. 22

II. Even under a regulatory takings analysis, the Final Rule was still a categorical taking........................................................................... 23

    CONCLUSION.................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*A & D Auto Sales, Inc. v. United States,*
748 F.3d 1142 (Fed. Cir. 2014)........................................................20, 24

*Acadia Technology v. United States,*
458 F.3d 1327 (Fed. Cir. 2006)..........................................................11, 12

*Akins v. United States,*
82 Fed. Cl. 619 (2008).............................................................3, 15, 16, 20

*Akins v. United States,*
312 F. App'x 197 (11th Cir. 2009)...........................................................16

*Allied-General Nuclear Services v. United States,*
839 F.2d 1572 (Fed. Cir. 1988)............................................18, 19, 20, 25

*AmeriSource Corp. v. United States,*
525 F.3d 1149 (Fed. Cir. 2008)..........................................................11, 12

*Andrus v. Allard,*
444 U.S. 51 (1979)............................................................................25, 26

*Bell Atl. Corp v. Twombly,*
550 U.S. 544 (2007).................................................................................6

*Caldwell v. United States,*
391 F.3d 1226 (Fed. Cir. 2004)...............................................................10

*Cambridge v. United States,*
558 F.3d 1331 (Fed. Cir. 2009)................................................................6

*Duncan v. Becerra,*
366 F. Supp. 3d 1131, (S.D. Ca. 2019).....................................................21

*Guedes v. BATFE,*
920 F.3d 1 (2019) (*per curium*)......................................................5, 14, 15

*Horne v. Department of Agriculture,*
-- U.S. --, S.Ct. 2419 (2015)......................................................2, 7, 21, 22

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)..................................................................3, 4, 10, 12

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992)..............................................................2, 10, 24, 25

*Maryland Shall Issue v. Hogan*,
353 F. Supp. 3d 400 (D. Md. 2018)........................................................21

*Miller v. Schoene*,
276 U.S. 272 (1928)...........................................................8, 9, 10, 11

*Mitchell Arms, Inc. v. United States*,
7 F.3d 212 (Fed. Cir. 1993)....................................................18, 19, 20, 25

*Mugler v. Kansas*,
123 U.S. 623 (1887)...........................................................8, 9, 10, 11

*Omaha Public Power District v. United States*,
69 Fed. Cl. 237 (2005)...............................................................................6

*Patty v. United States*,
136 Fed. Cl. 211 (2018).............................................................................8

*Penn Central Transportation Co. v. New York City*,
438 U.S. 104 (1978)................................................................................24

*Pennsylvania Coal v. Mahon*,
260 U.S. 393 (1922)................................................................................24

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)..................................................................................24

*United States v. Dow*,
357 U.S. 17 (1958)..................................................................................10

## Statutes

26 U.S.C. Chapter 53.................................................................................4

18 U.S.C. Chapter 44.................................................................................4

Pub. L. No. 99-308, 100 Stat. 449 (1986)..................................................4

**Rules**

RCFC 12(b)(6)……………………………………………………..……....6

**Regulations**

83 Fed. Reg. 66,523…………………………………………..…………2, 7

83 Fed. Reg. 66,514…………………………………………………….4

83 Fed. Reg. 7950……………………………………………….…..….4

83 Fed. Reg. 66,538……………………………………………..…….5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

THE MODERN SPORTSMAN, LLC, *ET AL.*,

      Plaintiffs,

v.

THE UNITED STATES,

      Defendant.

Case No.: 1:19-cv-449

Judge Loren A. Smith

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs brought this action against the United States (the "Government" or the "Defendant") after the Government took their private property without compensation in violation of the Fifth Amendment of the United States Constitution. Plaintiffs were the owners of bump-fire type rifle stocks (collectively referred to as "bump-stocks" or "stocks"). Bump-stocks were fully legal in the United States when Plaintiffs acquired them, and they remained legal at all times until the Government demanded their surrender or destruction at the end of 2018.

The taking of Plaintiffs' bump-stocks was prompted by President Donald Trump's direction to his Administration to "clarify" whether bump-stocks "should be illegal" in the wake of the Las Vegas mass shooting in October of the previous year. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") responded by revisiting the statutory definition of "machinegun," a category of firearms banned by

Congress in 1986, and artfully reimagining the agency construction of the term "machinegun" so that it could—for the first time—encompass bump-stocks. In December 2018, ATF rolled out a new legislative rule banning bump-stocks under the statutory ban on machineguns ("the Final Rule" or "Rule"). The Rule required owners of bump-stocks to surrender them to the Government or destroy them, even though legislative rules are prospective in nature, and the Final Rule was clear that a person in possession of a bump-stock type device was "not acting unlawfully *unless* they fail to relinquish or destroy their device *after* the effective date of this regulation." 83 Fed. Reg. at 66,523 (emphasis added).

The Government's new Rule requiring the surrender or destruction of lawfully acquired stocks was categorically a taking under any Fifth Amendment analysis—physical or regulatory. It was a classic physical taking because it totally and permanently dispossessed Plaintiffs of their tangible property. That is the very blueprint for a *per se* physical taking that demands compensation no matter how weighty the government interest behind it. *Horne v. Department of Agriculture*, -- U.S. --, S.Ct. 2419, 2427 (2015). However, even a regulatory taking analysis inexorably leads back to the conclusion that the Government has a categorical duty to compensate Plaintiffs for their losses because an act of government that confiscates or destroys property obviously necessarily also deprives its owner of all beneficial use of the property—the lynchpin of a categorical regulatory taking. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992).

Defendant tries to shoehorn the facts underlying Plaintiffs' claim to fit this Court's ruling in favor of the Government in *Akins v. United States*, 82 Fed. Cl. 619 (2008), by obscuring that the bump-stock Rule was an exercise of the ATF's *legislative* authority, not an *Akins*-style *interpretive* rule that merely enforces statutory restrictions that were always in place. The difference is not merely technical; it means that the property at issue in *Akins* was already illegal when the alleged taking occurred, while Plaintiffs' property was lawfully acquired and lawfully held up until the moment the Government required its surrender or destruction. The Government cannot rely on any of the narrow exceptions to categorical physical takings borrowed from *Akins* to justify the taking of Plaintiffs' legally held private property without compensation. The motion to dismiss must be denied.

## ISSUE PRESENTED

Whether the promulgation of a legislative rule banning lawfully acquired personal property that requires owners to physically surrender their property to the Government or destroy it and dispossess themselves of any scrap is a taking under the Fifth Amendment of the United States Constitution.

## STATEMENT OF THE CASE

The Takings Clause of the Fifth Amendment of United States Constitution provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment imposes a categorical duty on the government to pay just compensation for physical takings of private property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982).

A physical taking occurs when the state "absolutely dispossess[es] the owner of property." *Id.* at 435 n.12.

Three federal statutes regulate the sale and possession of firearms in the United States, the National Firearms Act of 1934 (NFA), 26 U.S.C. Chapter 53; the Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44; and the Firearm Owners Protection Act (FOPA), Pub. L. 99-308, 100 Stat. 449 (1986). The GCA and FOPA specifically define the term "machinegun," and in 1986, FOPA made it unlawful for any person to transfer or possess any firearm that meets the statutory definition of machinegun if it was not lawfully possessed before FOPA's effective date in 1986.

The ATF is the federal agency charged with administering the NFA, GCA and FOPA. For nearly a decade, the ATF issued a series of classification decisions announcing and affirming the agency determination that bump-stocks are not machineguns, as defined by the GCA and FOPA, and not subject to federal regulation. 83 Fed. Reg. at 66,514.

On February 20, 2018, President Donald Trump issued a "Presidential Memorandum on the Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices" as a response to the October 2017 Las Vegas mass shooting. President Trump noted that "the Obama Administration repeatedly concluded that particular bump stock type devices were lawful to purchase and possess," and announced that he had asked his Administration "to fully review how the Bureau of Alcohol, Tobacco, Firearms and Explosives regulates bumpfire stocks and similar devices." 83 Fed. Reg. 7950. The full review mandated by President

Trump culminated in the issuance of an ATF legislative rule that broadened elements of the definition of "machinegun" under the NFA, GCA and FOPA, such that the FOPA ban on machine guns could reach bump-stocks.

A challenge to the validity of the Final Rule is now pending in the United State District Court for the District of Columbia. The district court denied plaintiffs' motions for preliminary injunctions to halt the Rule's effective date, and the Court of Appeals for the D.C. Circuit affirmed the denial of preliminary injunctive relief on April 1, 2019. As part of its analysis, the district court determined that the Final Rule was legislative in nature and not merely interpretive. The D.C. Circuit agreed that the Rule is unequivocally legislative, notwithstanding "the government's litigating position in this case that seeks to reimagine the Rule as merely interpretive." *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 19 (2019) (*per curium*).

Plaintiffs are two corporations and two private individuals who legally acquired and possessed bump-stocks at the time of the issuance of the Final Rule.[1] Am. Compl. ¶¶ 14-17. All four Plaintiffs destroyed the bump-stocks in their possession and discarded the resulting scrap, in accordance with the Final Rule. Am. Comp. ¶¶ 39-42. The bump-stocks had no scrap value and cost Plaintiffs money to destroy. ¶ 43. Plaintiffs allege that the Rule's requirement that bump-stocks be surrendered or destroyed effected a taking under the Fifth Amendment of the United

---

[1] Based on ATF estimates, Plaintiffs' bump-stocks had a combined fair market value of approximately $22,498,500 at the time of the issuance of the Final Rule. Final Rule, 83 Fed. Reg. at 66,538.

States Constitution. Am. Compl. ¶ 13. The United States has not provided Plaintiffs

with just compensation for the taking of Plaintiffs' property. Am. Compl. ¶ 50.

## ARGUMENT

### Standard of Review

In considering a Rule 12(b)(6) motion for failure to state a claim, the Court

must construe the Amended Complaint in the light most favorable to Plaintiffs and

accept as true the facts as plead. *Cambridge v. United States,* 558 F.3d 1331, 1335

(Fed. Cir. 2009). As the moving party, the Government bears the burden of proving

that the complaint should be dismissed. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555

(2007). Under Rule 12(b)(6), a claim may be dismissed only if it asserts a theory

that is not cognizable as a matter of law or because it fails to allege sufficient facts to

support an otherwise cognizable legal claim. *Omaha Public Power District v. United*

*States*, 69 Fed. Cl. 237 (2005). The Government's motion must be denied if Plaintiffs

plead factual allegations that are enough to raise a right to relief above the

speculative level on the assumption that all the allegations in the complaint are true,

even if doubtful in fact. *Twombly*, 550 U.S. at 555.

I.   **The Government's Final Rule requiring surrender or destruction of lawfully acquired bump-stocks was a *per se* physical taking.**

The ATF Final Rule required owners of bump-stocks to surrender their private

property to the government or destroy it.[2] Those were the only two options. One way

or the other, Plaintiffs were permanently dispossessed of their property. The Rule

---

[2] The ATF's website confirms "[c]urrent possessors of bump-stock-type devices must divest themselves of possession as of the effective date of the final rule[.]" https://www.atf.gov/rules-and-regulations/bump-stocks (last visited June 18, 2019).

also acknowledged that ownership of the stocks before the effective date of the Rule of March 26, 2019 was entirely legal. 83 Fed. Reg. 66,523. This is a Fifth Amendment "taking" in the most literal sense of the word. The Rule did not just take *value* from Plaintiffs' property by over-regulating it; it actually *physically* took the tangible property itself. Unlike a taking by regulation that might leave the owner with some property rights intact, Plaintiffs were left with nothing.

The takings analysis of a physical dispossession of personal property by the Government is uncomplicated. The Government has a categorical duty to pay just compensation. A physical appropriation of personal property by the government is *per se* a taking that must be compensated, regardless of the public benefit the government sought to achieve or the economic impact on the owner. *Horne v. Department of Agriculture*, -- U.S. --, 135 S.Ct. 2419, 2425-27 (2015). Courts do not balance the government's interests against the owner's interest. The Government's obligation to compensate is absolute.

The Government insists that Plaintiffs' complaint does not state a claim under the Takings Clause but does not dispute that the Final Rule totally dispossessed Plaintiffs of their property. Instead, the Government seeks refuge from categorical liability by invoking narrow exceptions that are factually inapplicable as if they were broad exculpatory principles. Defendant first extravagantly pronounces that the Government can "generally" take whatever it wants whenever it wants without paying compensation by invoking the power of the state to exercise its police powers to protect public health and safety. Mot. at 9. The Government then broadly asserts

that, "a compensable taking does not occur when the Government takes property that is, or may be, subject to a statutory prohibition." *Id.* The Government has taken these principles out of specific factual contexts. They do not apply to Plaintiffs' claims.

### A. The Government's "police powers" do not excuse payment of just compensation for a categorical physically taking.

The Government acknowledges that the state cannot evade its legal obligation to pay just compensation when it physically takes private property merely by invoking the police powers of the state. Mot. at 11. Nonetheless, Defendant hides behind the vague assertion that "certain" exercises of police power justify taking property without compensation, *id.*, without making any attempt to identify *which* exercises of police power under *which* circumstances qualify for this narrow exception.[3]

Defendant cites two century-old Supreme Court decisions—*Miller v. Schoene* and *Mugler v. Kansas*. Neither decision was a physical takings claim and neither has any bearing on Plaintiffs' Fifth Amendment right to just compensation for property that was physically taken from them. The only thing that those cases have in common with this one is that they feature the buzz words "police power," "health," "safety," and "morals," and the Government suggests that somehow these words magically

---

[3] This Court has held that the narrow "police power" exception has only been applied with respect to property that is the subject of an investigation, property owned by an individual who is the subject of an investigation, or property that was "related, *before the fact*, to any violation of regulation or statute." *Patty v. United States*, 136 Fed. Cl. 211, 215 (2018) (emphasis added). As discussed *infra*, none of those circumstances obtain here.

8

establish that any exercise of police powers that invokes public safety cannot be a compensable taking under any analysis. The decisions themselves belie that claim.

The plaintiff in *Miller* asserted a claim under the Due Process Clause challenging a Virginia statute that diminished the value of his real property by requiring the removal of certain blighted cedar trees. 276 U.S. 272, 277 (1928). The Government represents that the Supreme Court found that "no compensable taking had occurred"—but that was not a takings case. The Supreme Court merely upheld the Virginia statute under a Due Process analysis. The Government strains to analogize *Miller* to Plaintiffs' claims by seizing on the Court's use of the term "destruction" to refer to the felling of the trees. Mot. at 11. The Court in *Miller*, however, explicitly found that the plaintiff had "the privilege of using the trees when felled." *Id.* at 277. More importantly, the issue before the Court was the detrimental impact of the statute on the value of Miller's land, but not its destruction. *Id.* To the extent that the Court's acceptance of the Government's public safety justification to uphold the Virginia statute can be extrapolated to takings claims, it can only be applied to regulations that *diminish* the value of property.

*Mugler* likewise adds nothing to the analysis of this case because it was nothing more than a nascent regulatory takings case. 123 U.S. 623 (1887). State legislation prohibited the plaintiffs from using their real property to manufacture or sell alcoholic beverages, but they retained possession of their property and could do anything they wished with it except sell or produce alcohol. *Id.* There is no indication

that the state of Kansas demanded surrender or destruction of alcohol that had been lawfully manufactured on the property before the Kansas statute was enacted.

In the century that has elapsed since *Mugler* and *Miller* were decided, the Supreme Court has specifically limited these two decisions to the regulatory takings context where the aggrieved owner retains some value in his property. The Supreme Court explained that these decisions were nothing more than the Court's "early formulation of the police power justification necessary to sustain (without compensation) any regulatory *diminution* in value[.]' *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1026 (1992) (emphasis added) (citing *Mugler v. Kansas*, 123 U.S. 623 (1887) and *Miller v. Schoene*, 276 U.S. 272 (1928)).

Whatever application these cases may have to regulatory takings that work a diminution in value, they are irrelevant to a physical takings analysis of Plaintiffs' claims. The rule has always been that a physical invasion or a physical appropriation[4] of property is a *per se* taking, without regard to other factors. *Loretto*, 458 U.S. 419.

The Government makes a second attempt to fashion a general "police powers" exemption from the Takings Clause out of a narrow category of government seizures of property that do not require compensation: the seizure of property to be used as evidence in a criminal prosecution and the seizure of property that is subject to an *in rem* civil forfeiture proceeding. The cases cited by the Government demonstrate that Plaintiffs' claims have no relationship to either category.

---

[4] Physical appropriation occurs when the "owner [is] deprived of valuable property rights, even [if] title ha[s] not formally passed." *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (citing *United States v. Dow*, 357 U.S. 17, 23 (1958)).

In *Acadia Technology v. United States*, the Government took Acadia's property pursuant to its authority under the Lanham Act to seize imported goods suspected of bearing a counterfeit mark. 458 F.3d 1327, 1329 (Fed. Cir. 2006). Plaintiffs' bump-stocks were never suspected of being in violation of any statutory scheme when they were taken. Similarly, in *AmeriSource Corp. v. United States*, the Government seized prescription drugs sold by plaintiffs to a pharmacy whose principals were indicted for "conspiracy, unlawful distribution of prescription pharmaceuticals, operating an unregistered drug facility, and conspiracy to commit money laundering." 525 F.3d at 1150. The *AmeriSource* plaintiffs were not implicated in the indictment, but their property, the drugs that had allegedly been unlawfully distributed, were implicated in the crimes. *Id.* In both cases, the property taken by the Government was *itself* implicated in unlawful activity, whereas neither Plaintiffs nor their bump-stocks were implicated in any criminal scheme. The Government did not seize the bump-stocks to serve as evidence in a criminal investigation, nor were they the "suspected instrumentality of a crime." The Government simply required the surrender or destruction of lawfully obtained property as part of the state's resolution to strike a new balance between the right to bear arms and public perceptions of safety.

The Government has done nothing more than cull cases featuring the words "police power" that were decided in the government's favor and present them as if they have universal application to all takings. Unlike the Supreme Court's early regulatory decisions in *Mugler* and *Miller*, Plaintiffs' property was not merely diminished in value; it was physically taken outright. Unlike the Federal Circuit's

11

decisions in *Acadia* and *AmeriSource*, Plaintiffs' property was not taken as part of the state's prosecution of a criminal statute—either as evidence of a crime or as the suspected instrumentality of a crime; it was merely taken because the Government rebalanced some citizens' right to bear arms against other citizens' desire for greater gun control. Defendant has presented no authority for the proposition that the Final Rule was one of the "certain" exercises of police power that absolves the Government of the obligation to pay just compensation for the private property it takes. There is nothing about the physical taking exacted by the Government's exercise of its police powers in the Final Rule to remove it from the general proposition that the validity of an exercise of the state's police power is a question that is separate and apart from the takings analysis. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982).

**B.    Bump-stocks were neither "property that is subject to a statutory   prohibition" nor "property that may be subject to a statutory   prohibition" within the meaning of Takings jurisprudence.**

In its second asserted defense, the Government proposes that, "a compensable taking does not occur when the Government takes property that is, or may be, subject to a statutory prohibition[,]" seemingly suggesting that takings jurisprudence treats what Defendant vaguely describes as "property that *may* be subject to a statutory prohibition" the same as it treats property that *is* statutorily prohibited. The latter is contraband plain and simple, whereas the former could be just about anything. For purposes of clarity of analysis, Plaintiffs address each prong separately, beginning with property prohibited by statute.

1.    *Bump-stocks were not statutorily prohibited property when the Final Rule took them.*

At the beginning of its motion, Defendant introduces its contention that the Final Rule cannot be a taking because the Rule merely enforced an existing statutory prohibition on the possession of bump-stocks. The Government can only argue that the Final Rule was mere enforcement of a statutory bar if bump-stocks were subject to a statutory bar, and Defendant appears to be headed in that direction in the beginning of the motion. The Government maintains that Plaintiffs "urge that enforcing the prohibition on machine guns in this case gives rise to a taking." Mot. at 2. In the Summary of Argument, the Government again insists that no taking can be found because the Government was merely enforcing a 1986 statutory prohibition on Plaintiffs' property:

> No taking would have occurred even absent a statutory prohibition. Here, however, plaintiffs' sole complaint is that the Government is enforcing a statutory bar on the transfer or possession of machine guns.

Mot. at 9-10. Casting the Final Rule as enforcement of an existing statutory bar would certainly be the Government's best shot at evading Fifth Amendment liability, but the Government does not pursue that argument in the body of its motion.[5] That is because the United States Court of Appeals for the D.C. Circuit effectively shut down the contention that Plaintiffs' bump-stocks were "property subject to a statutory

---

[5] Once, near the end of the Argument, the Government breezily alludes to the position that bump-stocks were always illegal by characterizing Plaintiffs' possession of bump-stocks as a test of "the limits of a criminal prohibition in the highly regulated area of firearms," mot. at 16, but does not directly make the argument that the statutory machinegun prohibition *always* included bump-stocks.

prohibition" in its April 1, 2019 decision in *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1 (2019).

As the D.C. Circuit explained in *Guedes*, the Final Rule was a legislative rule with the force and effect of law that criminalized the possession of Plaintiffs' previously lawful property *going forward*. *Id.* at 17-21. The inescapable upshot from the *Guedes* decision is that bump-stocks were legal before the Final Rule was issued.

The reasoning in *Guedes* is unassailable. The Administrative Procedures Act distinguishes between legislative rules and interpretive rules. *Id.* at 17. Legislative rules result from an agency's exercise of delegated legislative power from Congress and have the force of law. *Id.* at 17-18. Interpretive rules merely advise the public of the agency's construction of the statutes it administers. *Id.* Legislative rules establish a new legal rule going forward, whereas interpretive rules reflect what the interpreted statute always meant. *Id.* at 19.

To determine whether an agency rule is legislative or interpretive, courts ask whether the agency intended to speak with the force of law, as reflected by the language the agency uses in the rule, the agency's specific invocation of its general legislative authority, and the inclusion of the rule in the Code of Federal Regulations. *Id. at 18*. The D.C. Circuit found every indication that the Final Rule "unequivocally bespeaks an effort to adjust the legal rights and obligations of bump-stock owners, i.e., to act with the force of law." *Id.* The language of the Rule itself clearly indicates that bump-stocks will be prohibited only in the future when the Rule takes effect. *Id.* The Rule specifically invokes both its legislative authority delegated by Congress and

14

the *Chevron* deference accorded only to legislative rules by the courts. *Id*. The ATF published the Final Rule in the Code of Federal Regulations. *Id*.

*Guedes* determined that the Final Rule was legislative despite the Government's efforts to recast the rule as interpretive, presumably to pre-empt takings claims like Plaintiffs. *Guedes* observed that if the Government's assertion that the Final Rule was an interpretive rule was correct, then bump-stocks would always have been illegal and any possessors would have always been felons. *Id*. That would also mean in this case that the Plaintiffs did not acquire any rights in their illegal contraband property. The D.C. Circuit, however, noted that the Final Rule itself assured bump-stock owners that "[a]nyone currently in possession of a bump-stock-type device is not acting unlawfully unless they fail to relinquish or destroy their device after the effective date." *Id*. at 18.

After *Guedes*, it is clear that the Final Rule was prospective only and any contention that statutorily prohibited property cannot support a takings claim is irrelevant to Plaintiffs' claims. It is also what distinguishes Plaintiffs' claims from this Court's decision in *Akins v. United States*. The ATF reclassification of the Akins Accelerator, described in Defendant's motion (Mot. at 13-14) was an interpretive rule with retroactive effect. Unlike the Final Rule, it had no indicia of the agency's intention to exercise its legislative authority—e.g., it did not reference the ATF's delegated legislative authority or make a case for *Chevron* deference, and it was not published in the Code of Federal Regulations.

Just as compelling as the legal distinctions between the *Akins* rule and the Final Rule are the real-world indications that ATF was acting in its retroactive interpretive capacity in *Akins* and in its prospective legislative rule-making capacity when it promulgated the Final Rule. The ATF's early determinations that the Akins device did not meet the definition of machinegun were made on the basis of design specifications and a non-functioning sample of the device. The determination was based only on the Accelerator's "theory of operation," which "was clear even though the rifle/stock assembly did not perform as intended." See *Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009). The subsequent determination that the Accelerator was a "machinegun" under the federal firearms statutes was the result of the ATF's obtaining and testing an Accelerator that did perform as intended. *Akins*, 82 Fed. Cl. at 621.

The Final Rule's change of heart about bump-stock devices, on the other hand, was unrelated to organic statutory interpretation or new technical information about how bump-stock devices function. It was prompted by a mandate from the White House. It was political. President Trump underscored the political nature of the "clarification of the law" he sought about bump-stocks by reminding the public that "the Obama Administration repeatedly concluded that particular bump stock type devices were lawful to purchase and possess." The Final Rule was prompted by a change in policy, not by greater familiarity with the device at issue. Whether the Final Rule is considered from a layperson's real-world perspective or subjected to legal analysis, it was obviously new legislation, not interpretation of statutory

language. Consequently, it is not surprising that the Government shrinks from attempting to develop the argument that Plaintiffs' property was "subject to a statutory prohibition." Analysis and the D.C. Circuit have utterly removed the ground from underneath that contention. Nonetheless, Defendant left a ghost of that argument lingering in its formulation of the defense that "a compensable taking does not occur when the Government takes property that is, or may be, subject to a statutory prohibition." Mot. at 9. Certainly, the sturdy proposition that statutorily prohibited property cannot support a takings claim bolsters the otherwise vague and dubious assertion that property that "may be subject to a statutory prohibition" cannot be the basis of takings claim. To be clear, however, each proposition has to stand on its own, and there is no factual basis for the first prong that characterizes Plaintiffs' property as "subject to a statutory prohibition." It was not. Nor has the Government *argued* that it was; it merely pitched the idea in a suggestive manner. The suggestion must be rejected.

2.   *The possibility that tangible private property "may" be subject to a statutory prohibition does not preclude a compensable takings claim.*

The Government insists that property that "may be subject to a statutory prohibition" does not give rise to a compensable taking. Property that "may be subject to a statutory prohibition" is arguably *all* property, with the possible exception, ironically, of a property interest in firearms because the right to bear arms is protected by the Second Amendment of the United States Constitution. The Government has crafted this absurdly broad contention out of a narrow exception to Takings in the hopes that it will go unnoticed that it does not apply to Plaintiffs'

17

claims. The only way to divine when property that "may be subject to a statutory prohibition" is *actually* unprotected by the Takings Clause is to distill the narrow exception from the cases cited by Defendant.

The Government cites to two Federal Circuit cases in which plaintiffs asserted a property interest in a business expectation that depended on the issuance of a government permit. In both *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993) and *Allied-General Nuclear Services v. United States*, 839 F.2d 1572 (Fed. Cir. 1988), the Federal Circuit refused to find a taking under the Fifth Amendment for Plaintiffs who complained that the government denied them an anticipated federal permit that was necessary to operate business operations importing semiautomatic rifles and recycling plutonium, respectively. Both courts held that such business expectancies are not property rights protected by the Fifth Amendment because Mitchell's business was subject to governmental regulation of firearms importation and Allied-General's business was subject to regulation of nuclear facilities. *Mitchell Arms*, 7 F.3d at 217. In other words, neither Plaintiff ever had exclusive possession of the taken "property"; it always shared possession with the federal government. *Id.* at 215.

Plaintiffs' claims do not flow from the denial of a government permit. Nor do Plaintiffs claim a property interest in a business expectation. Plaintiffs' claims are simpler. Plaintiffs owned tangible personal property. The Final Rule took tangible property from Plaintiffs by forcing its surrender or destruction. The Government makes no attempt to explain how the rule in *Mitchell Arms* and *Allied-General* has

any application to takings claims for the actual physical bump stocks. It is not enough to point out, as the Government does, that both Plaintiffs' claims and *Mitchell Arms* concern firearms. So what? In fact, the Federal Circuit even anticipated the game-changing distinction between Plaintiffs' claims and *Mitchell Arms:*

> In revoking the permits, ATF withdrew its prior authorization for Mitchell to sell certain types of assault rifles in the United States. **Otherwise, Mitchell retained complete control over the rifles. Mitchell could have done anything it wished with the rifles, except import them into the United States in their original configuration. Put another way, ATF did not take the rifles.**

*Id.* at 217 (emphasis added). It should be sufficient to view Plaintiffs' claims through the lens of the reasoning in *Mitchell Arms* to defeat the Government's motion to dismiss and, indeed, to prove Plaintiffs' takings claims: Plaintiffs retained no control over the bump-stocks. Plaintiffs couldn't do anything with the bump-stocks but surrender or destroy them. Put another way, ATF took the bump-stocks.

*Mitchell Arms* and *Allied-General* show that the Federal Circuit has deemed a certain type of property—business expectancies in highly regulated areas—to be unprotected by the Fifth Amendment because property owners always shared control of it with the government. Plaintiffs' property was tangible and never shared with the government. Conceptually, the *Mitchell Arms* framework does not apply to Plaintiffs' Claims. Factually, it is also unsupportable to characterize Plaintiffs' ownership interest in tangible bump-stocks as an interest that "may be subject to a statutory prohibition" because the Government did everything it could, in more than ten ATF classification decisions before reversing course in the Final Rule, to reassure

purchasers of bump-stocks that their property would not be subject to a statutory prohibition.

To the extent that the business expectation defense explains this Court's ruling in *Akins v. United States*, (Mot. at 13), that case falls squarely into a single bucket with *Mitchell Arms* and *Allied-General*. It is not relevant to Plaintiffs' claim for compensation for their property interest in tangible bump-stocks. If the Government invokes the police powers defense relied on in *Akins*, the plaintiff's property there was always contraband because it was reclassified by an interpretive rule issued by the ATF. As the Federal Circuit explained in *A & D Auto Sales, Inc. v. United States*, "[i]f a challenged restriction was enacted before the property interest was acquired, the restriction may be said to inhere in the title. If a challenged restriction was enacted after the plaintiff's property interest was acquired, it cannot be said to "inhere" in the plaintiff's title." 748 F.3d 1142, 1152 (Fed. Cir. 2014). The D.C. Circuit made unequivocally clear that the restriction on bump-stocks imposed by the Final Rule had not been enacted when Plaintiffs acquired title in their bump-stocks. *Akins* consequently has no bearing on Plaintiffs' case.

### C.   Federal district court decisions on state laws banning the possession of bump-stocks do not determine the validity of Plaintiffs' claims.

The Government inexplicably wraps up its discussion of the viability of business expectations as a cognizable property interest by switching gears to address police powers as a justification for a state law ban on bump-stocks. Defendant cites to a recent federal district court decision in the District of Maryland rejecting a

takings challenge to Maryland's ban on bump-stocks, *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400 (D. Md. 2018). It is questionable whether the analysis of a state's police powers is applicable to federal exercise of police powers, and the District of Maryland's takings rulings with respect to Maryland laws certainly are not binding on this Court. However, if the Court intends to consider the decisions of sister courts with respect to state laws to resolve Plaintiffs' claims, *Maryland Shall Issue* should not be the Court's only source.

The Southern District of California reached the conclusion that a California state law banning and dispossessing owners of their lawfully acquired large capacity gun magazines was a taking in violation of the Fifth Amendment. *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1184 (S.D. Ca. 2019). The Southern District of California characterized the California law as a "rare hybrid taking" in that it forces owners to choose between surrendering their property to law enforcement for destruction (effecting a *per se* taking), selling their magazines at a deeply discounted rate, or removing the magazines from the state. *Id.* The court in *Duncan* concluded that "[w]hatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical dispossession of such lawfully-acquired private property without compensation." *Id.* The reasoning of the Southern District of California is in keeping with the United States Supreme Court's view of the U.S. Constitution's concern about the *manner* in which the state achieves its ends. *See Horne*, 135 S. Ct. at 2428.

D.    **A ruling upholding Plaintiffs' Fifth Amendment right to just compensation will not unleash the Government's threatened parade of horribles.**

Defendant insists that the Court must give the Government a pass for taking Plaintiffs' personal property without compensation in violation of the Fifth Amendment because "the upshot of accepting Plaintiffs' theory of the case is that the Government would be required to compensate owners for the value of any property the possession of which was deemed unlawful, no matter how harmful." Mot. at 17.

That's a fine contention in the ether, but it doesn't come close to articulating the nuance of what Plaintiffs are asking the Court to do. Plaintiffs are not asking for a broad ruling on any property that is deemed unlawful. Plaintiffs' claim requires only that the Court find that the Final Rule on bump-stocks, as it was written and applied to Plaintiffs' property, was a taking. Plaintiffs' claims specifically concern a federal agency's use of legislative rule-making authority to issue a ban on private property that requires lawful property owners to surrender or destroy their property. Accepting Plaintiffs' argument with respect to the Final Rule does *not* mean the Government would be required "to compensate owners for the value of any property the possession of which was deemed unlawful, no matter how harmful."  The Court does not have to decide whether deeming property unlawful would constitute a taking. The Final Rule did more than deem bump-stocks unlawful; it required the surrender or destruction of lawfully acquired bump-stocks. A physical taking and a regulatory prohibition may have the same economic impact on a property owner, but the Constitution is concerned with means as well as ends. *Horne*, 135 S. Ct. at 2428.

22

Takings are fact-specific individual inquiries. It is fear-mongering to vaguely suggest that vindicating Plaintiffs' Fifth Amendment rights would hamper the federal government's ability to regulate new synthetic drugs or any other arguably harmful product. The statutory framework for regulating controlled substances is broader and more flexible than federal firearms statutes, perhaps because there is no constitutional amendment protecting the right to possess controlled substances or widespread public concern about government infringement on those rights. The Government has not pointed to a single instance when the regulation of a new drug—a product that is consumable—was accomplished by a requirement of surrender (for no compensation) or destruction, as the Final Rule did. By its very nature, a new synthetic drug can be manufactured at any time, so it would make little sense to mandate surrender or destruction as part of a new ban.

It is easier to imagine the insidious erosion of private property rights that will ensue if the Court accepts the Government's position and sanctions the taking of Plaintiffs' lawfully-acquired property without compensation. Public safety is an amorphous and value-laden concept. If the state can freely take private property merely by asserting a prevailing notion of what poses a public safety concern, firearms will not be the only category of private property at risk of government usurpation.

## II.   **Even under a regulatory takings analysis, the Final Rule was still a categorical taking.**

It would require a suspension of commonsense to deny application of physical takings analysis to Plaintiffs' claims because the Final Rule required Plaintiffs to

surrender tangible property or destroy it. However, even if the Final Rule were construed as a regulatory taking, it would, nonetheless, be a *per se* regulatory taking. The result of the Rule for Plaintiffs is the same whether the Rule is characterized as a physical taking by focusing on the outcome of dispossession or a regulatory taking by emphasizing that it was accomplished by means of regulation: the Rule stripped Plaintiffs of all property rights in the property they lawfully acquired.

The Government may reasonably regulate property, but a taking will occur when a police power regulation goes "too far." *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 415 (1922). In Penn *Central Transportation Co. v. New York City*, the Supreme Court attempted to develop a test for how far was "too far," explaining that it required an "ad hoc" factual inquiry. 438 U.S. 104, 124 (1978). However, the Supreme Court subsequently clarified that where the state seeks to sustain regulation that deprives land of all economically beneficial use, the Government must pay just compensation unless the proscribed use interests were not part of his title to begin with. *Lucas*, 505 U.S. at 1027.[6]

The Federal Circuit has equally applied this principal to tangible personal property. *A & D Auto Sales, Inc.,* 748 F.3d at 1151. Opponents of applying a *per se* regulatory taking analysis to personal property rely on the *Lucas* decision itself, but

---

[6] The Government stops short of suggesting that the right to possess does not inhere to the title of lawfully acquired tangible property. Such inherent rights are of course defined by each individual state's common law of property and nuisance. *Lucas*, 505 U.S. at 1029; see also *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 84 (1980) ("Nor as a general proposition is the United States, as opposed to the several States, possessed of residual authority that enables it to define "property" in the first instance.").

as noted by the Federal Circuit the frequently-quoted language from *Lucas* does not foreclose a finding of *per se* regulatory taking of personal property. In *Lucas*, the Court's admonished that, "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Lucas*, 505 U. S. at 1027-28. Notably, the Court did not say that the owner of personal property ought to be aware that new regulation might require the surrender or destruction of his property. Awareness of the state's "traditionally high control over *commercial* dealings" (emphasis added) does not put an owner of tangible personal property on notice that the government might demand the surrender or destruction of his property. Private ownership of tangible property is not commercial dealing. The Court's emphasis on the state's control over *commercial dealings* suggests that the Court was limiting Fifth Amendment protection for personal property of business expectancy nature, like that claimed in *Mitchell Arms* and *Allied-General* or, as the Court suggests in its final parenthetical, interests in the sale and manufacture of personal property, as opposed to the mere possession of personal property. Indeed, the Court's earlier decision in *Andrus v. Allard* supports such a holding. In *Andrus*, the Secretary of the Interior promulgated regulations that criminally prohibited commercial transactions in parts of birds lawfully acquired before they came under the protection of the Eagle Protection Act and the Migratory Bird Treaty Act. *Andrus v. Allard*, 444 U.S. 51, 54

(1979). L. Douglas Allard challenged the regulations as a taking of his lawfully acquired property under the Fifth Amendment. *Id.* at 55. The Supreme Court held that the simple prohibition of the sale of lawfully acquired property does not effect a taking in violation of the Fifth Amendment when the challenged regulations "do not compel the surrender" of the property in question, and "there is no physical invasion or restraint upon" it. *Id.* at 65. But the Court warned that "it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds." *Id.* at 66. When the effect of regulation is that the owner of personal property is entirely dispossessed of what was lawfully his, a finding of *per se* taking is permissible under a regulatory analysis.

## <u>CONCLUSION</u>

If the fundamental right of private property does not protect Plaintiffs here, then the property of all Americans is left to the mercy of federal authorities who could force anyone to surrender their property, even when it was lawfully acquired, without paying compensation. Plaintiffs respectfully ask the Court to deny the Government's motion to dismiss.

Dated: <u>June 23, 2019</u>                    Respectfully Submitted,


                                   <u>/s/ *Ethan A. Flint*</u>
                                   Ethan A. Flint, *Attorney of Record*

                                   <u>/s/ *Adam M. Riley*</u>
                                   Adam M. Riley, *Of Counsel*

                                   Flint Law Firm, LLC
                                   222 E. Park St., Suite 500
                                   P.O. Box 189
                                   Edwardsville, IL 62025
                                   T: (618) 288-4777   F: (618) 288-2864
                                   eflint@flintlaw.com
                                   ariley@flintlaw.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on June 23, 2019, I caused a true and correct copy of the foregoing Plaintiffs' Opposition to Defendant's Motion to Dismiss to be served by electronic filing on the counsel of record for the Government:

> Nathanael B. Yale
> United States Dept of Justice
> Civil Division
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C. 20044
> Nathanael.B.Yale@usdoj.gov

By:     /s/ *Adam M. Riley*
        Adam M. Riley, *Of Counsel*