# In the United States Court of Federal Claims

No. 19-449
Filed: October 23, 2019

|  |  |  |
|---|---|---|
| THE MODERN SPORTSMAN, LLC, et al., | ) ) ) ) | Fifth Amendment Takings Claim; Informal Rulemaking; Police Power; Bureau of Alcohol, Tobacco, Firearms and Explosives; Bump Stock; Machinegun; Motion to Dismiss; RCFC 12(b)(6). |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

*Ethan Albert Flint*, Flint Law Firm, LLC, Edwardsville, IL, for plaintiffs.

*Nathanael Brown Yale*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

## OPINION AND ORDER

*SMITH*, **Senior Judge**

In reviewing this case, the Court is sympathetic to the plaintiffs who have lost the rights to the bump stocks they purchased while they and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") seemingly thought bump stocks were not machineguns and were therefore legal. In a private context, what occurred would be remedied by the concept of justifiable reliance and plaintiffs would be compensated. However, the law is different in this case because the government, as the sovereign, has the power to take property that is dangerous, diseased, or used in criminal activities without compensation. Here, ATF acted properly within the confines of the limited federal police power. In nearly all cases, if the government confiscated a gun legally possessed by a person not committing a crime, the government would have to pay just compensation or return the gun. Importantly, however, guns are protected by the Second Amendment of the Constitution, but machineguns are not, as the crime waves of the 1920s and 1930s convinced Congress that machineguns do not fall within the scope of protections offered by the Second Amendment. The courts have not overturned this measure and this Court will not endeavor to do so now.

This case is before the Court on defendant's Motion to Dismiss. On December 26, 2018, the Department of Justice's ("DOJ") Bureau of Alcohol, Tobacco, Firearms and Explosives issued a Final Rule clarifying that the term "machinegun" encompasses "bump-stock-type device[s]" (hereinafter "bump stocks"), and consequently requiring the timely surrender or

destruction of bump stocks.[1]  Plaintiffs allege that the Final Rule's requirement to surrender or destroy their bump stocks effected a Fifth Amendment taking of their property.

The impetus for ATF modifying its regulations arose when, after the deadly mass shooting in Las Vegas on October 1, 2017, President Trump issued a memorandum to the Attorney General. *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 83 Fed. Reg. 7,949, at 7,949–50 (Feb. 20, 2018) (hereinafter "Bump Stock Memorandum").  In that memorandum, the President urged the DOJ to "fully review" how ATF regulates bump stocks and similar devices, and, "as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.*; *see Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514, 66,516–17 (Dec. 26, 2018) (to be codified at 27 C.F.R. pts. 447, 478, 479) (hereinafter "Final Rule").  In response to the President's Bump Stock Memorandum, ATF published a Notice of Proposed Rulemaking in the Federal Register on March 29, 2018, in which it proposed changes to its regulations concerning machineguns listed at 27 C.F.R. §§ 447.11, 478.11, and 479.11. *Bump-Stock-Type Devices*, 83 Fed. Reg. 13,442 (proposed Mar. 29, 2018) (hereinafter "NOPR").  After an opportunity for notice and comment, which closed on June 27, 2018, ATF published a Notice of the Final Rule on December 26, 2018. *See generally* Final Rule.  The Final Rule had an effective date of March 26, 2019, affording owners of bump stocks a period of ninety days to either destroy or surrender their devices at a local ATF office. *Id.* at 66,530, 66,554.  Accordingly, plaintiffs collectively destroyed and discarded the resulting scrap from 74,995 bump stocks.[2]  *See* Amended Complaint (hereinafter "Am. Compl.") at 7.

Plaintiffs filed their Complaint with this Court on March 26, 2019, and an amended complaint on March 28, 2019. *See generally* Complaint; *see generally* Am. Compl.  On May 28, 2019, defendant filed its Motion to Dismiss pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), arguing that a taking did not occur because the requirement to surrender or destroy bump stocks served to protect the public health and safety, and was therefore a valid exercise of the police power.  Defendant's Motion to Dismiss (hereinafter "Def.'s MTD") at 1.  Defendant further alleged that "a compensable taking does not occur when

---

[1]  Pursuant to the transfer of functions from the Department of the Treasury to the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") under the Homeland Security Act of 2002, the Attorney General is responsible for prescribing rules and regulations necessary to carry out the provisions of 18 U.S.C. §§ 921 *et seq.* (2018), which concern crimes and criminal procedure related to firearms.  Homeland Security Act of 2002, Public Law 107-296, 116 Stat. 2135 (2002); 26 U.S.C. §§ 7801, 7805 (2018) (authorizing the Secretary of the Department of Treasury to administer and enforce this title, and to "prescribe all needful rules and regulations for the enforcement of this title."); 18 U.S.C. § 926 (providing the Attorney General with the authority to prescribe rules and regulations to carry out the provisions of 18 U.S.C. §§ 921 *et seq.*).

[2]  Plaintiff, The Modern Sportsman, LLC, destroyed and discarded the resulting scrap from 1,479 bump stocks; plaintiff RW Arms, Ltd. destroyed and discarded the resulting scrap from 73,462 bump stocks; plaintiff Mark Maxwell destroyed and discarded the resulting scrap from 29 bump stocks; and plaintiff Michael Stewart destroyed and discarded the resulting scrap from 25 bump stocks pursuant to the Final Rule.  Plaintiffs' Amended Complaint at 7.

the Government takes property that is, or may be, subject to a statutory prohibition." *Id.* Plaintiffs filed their Response to defendant's Motion to Dismiss on June 23, 2019, reiterating their takings arguments. *See generally* Plaintiffs' Opposition to Defendant's Motion to Dismiss (hereinafter "Pls.' Resp."). On July 22, 2019, defendant filed its Reply in support of its Motion to Dismiss. *See generally* Defendant's Reply in Support of Its Motion to Dismiss (hereinafter "Def.'s Reply"). The Court held oral argument on August 28, 2019, and defendant's Motion to Dismiss is fully briefed and ripe for review. For the reasons set forth below, the Court grants defendant's Motion to Dismiss.

**I.      Background**

Over the past century, Congress has passed a series of laws to regulate the interstate firearms industry with the underlying goal of increasing public safety. When enacting the first of these major statutes, the National Firearms Act of 1934 ("NFA"), Congress wanted to ensure firearm regulations would not be too liberally construed. *See* H.R. REP. NO. 73-9741, at 1–2 (1934). Accordingly, the NFA regulated the manufacture, importation, and dealing of a narrowly-tailored set of firearms.[3] 26 U.S.C. § 5801 *et seq.* (2018); *see* H.R. REP. NO. 73-9741, at 1–2 (1934). Among those firearms was the "machine gun," which the NFA originally defined as "any weapon which shoots, or is designed to shoot, automatically or semi-automatically, more than one shot, without manual reloading, by a single function of the trigger." National Firearms Act, 73 Pub. L. No. 474, 48 Stat. 1236 (1934); H.R. REP. NO. 73-9741, at 1–2.

Congress further augmented its regulation of machineguns through the Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 *et seq.* The purpose behind enacting the GCA was to more effectively regulate interstate commerce in firearms, with the ultimate goal of combatting the "skyrocketing increase in the incidence of serious crime." S. REP. NO. 89-1866, at 1 (1966); *see generally* 18 U.S.C. § 921 *et seq.* Moreover, Congress sought "to reduce the likelihood that [firearms] fall into the hands of the lawless or those who might misuse them," and to assist States and their political subdivisions in enforcing existing firearms laws. S. REP. NO. 89-1866, at 1; *see generally* 18 U.S.C. § 921 *et seq.*

Less than two decades later, Congress passed the Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (1986), reiterating its desire to fight violent crime while simultaneously strengthening protections for the rights of law-abiding gun owners. 132 Cong. Rec. 9590 (1986) (statement of Sen. Orrin Hatch); *see generally* Pub. L. No. 99-308, 100 Stat.

---

[3]    The National Firearms Act of 1934 originally defined "firearms" as:

> [A] shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

National Firearms Act, 73 Pub. L. No. 474, 48 Stat. 1236 (1934); H.R. REP. NO. 73-9741, at 1 (1934).

449 (1986). Significantly, FOPA added 18 U.S.C. § 922(o) to the GCA, making it "unlawful for any person to transfer or possess a machinegun" not lawfully obtained prior to May 19, 1986. Consistent with this prohibition, both FOPA and the GCA incorporated the definition of "machinegun" as used in the NFA,[4] which the NFA has for decades defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include *the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added).

Altogether, these three statutes form the foundation upon which ATF has promulgated rules and regulations that interpret and enforce the objectives of those statutes, including restrictions related to the prohibition on owning machineguns not lawfully obtained prior to 1986. Indeed, since the enactment of FOPA in 1986, ATF has promulgated a number of regulations interpreting provisions of the GCA and NFA pursuant to its delegated authority to investigate and enforce criminal and regulatory violations of Federal firearms law. Def.'s MTD at 5 (citing 18 U.S.C. § 926(a), 26 U.S.C. §§ 7801(a)(2)(A), 7805(a), 28 U.S.C. § 599A(b)(1), 28 C.F.R. § 0.130(a)(1)–(2)). Among those regulations are 27 C.F.R. §§ 447.11, 478.11, and 479.11, which contained identical definitions of the term "machinegun" to those in the NFA and GCA prior to the Final Rule. Final Rule at 66,514. Pursuant to those regulations and ATF's delegated authority, if the owner of a firearm or device wants to know if their firearm or device meets the definition of "machinegun," he or she may request a clarification letter from ATF; ATF may in turn require the submission of a prototype for testing.[5] BUREAU OF ALCOHOL,

---

[4]   The National Firearms Act of 1934 originally included the term machinegun as two words, 73 Pub. L. No. 474, 48 Stat. 1236, but now includes machinegun as one word, 26 U.S.C. § 5845(b) (2018).

[5]   Section 7.2.3.1 of the ATF Handbook also provides the following disclaimer:

> ATF letter rulings classifying firearms may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws. Nevertheless, classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations. To make sure their classifications are current, FFLs/SOTs should stay informed by periodically checking the information published on ATF's website, particularly amendments to the law or regulations, published ATF rulings, and "open letters" to industry members.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, NATIONAL FIREARMS ACT HANDBOOK § 7.2.3.1 (2009), https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-chapter-7/download.

TOBACCO, FIREARMS AND EXPLOSIVES, NATIONAL FIREARMS ACT HANDBOOK § 7.2.4 (2009), https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-chapter-7/download.

### A. 2006–2017 ATF Classification Decisions

In 2002, ATF received a request for clarification regarding the Akins Accelerator, which ATF temporarily determined was not a machinegun. Final Rule at 66,517. Upon further review of the device and receipt of related requests from members of the firearms industry, however, ATF determined that the Akins Accelerator was in fact a machinegun. *Id.* (citing ATF Ruling 2006-2). Thus, ATF first classified a certain bump stock as a machinegun in 2006, concluding that "a device attached to a semiautomatic firearm that uses an internal spring to harness the force of a firearm's recoil so that the firearm shoots more than one shot with a single pull of the trigger is a machinegun." *Id.* at 66,514. ATF reached this decision by interpreting the phrase "single function of the trigger" from the NFA's definition of machinegun to synonymously mean "single pull of the trigger."[6] *Id.* at 66,514. As a result, ATF required all owners of the Akins Accelerator to remove the internal spring and either dispose the spring or surrender it at an ATF location. *Id.* at 66,517. When later presented with the question of whether the result of this clarification decision effected an unconstitutional taking, this Court held it did not. *Akins v. United States*, 82 Fed. Cl. 619, 622–23 (2008).

Notwithstanding its 2006 classification decision, between 2008 and 2017, ATF received additional clarification requests from owners of bump-stock-type devices with varying functional differences as compared to the Akins Accelerator. Final Rule at 66,514; *see* Am. Compl. at 6. Based largely on ATF's hasty conclusion that "the devices did not rely on internal springs or similar mechanical parts to channel recoil energy," ATF concluded that those other bump-stock-type devices did not meet the definition of machinegun. *See* Final Rule at 66,514, 66,518; *see also* Am. Compl. at 6. However, ATF concurrently concluded that other types of trigger actuators, two-stage triggers, and other devices were in fact illegal machineguns under 18 U.S.C. § 922(o) based on its interpretation of "single pull of the trigger." Final Rule at 66,517–18.

### B. Issuance of the Final Rule

In the wake of the deadly mass shooting in Las Vegas, President Trump issued the Bump Stock Memorandum in light of the disparity in ATF's classifications of bump stocks and related devices. *See generally* Final Rule. In response, ATF began reviewing its prior classification

---

[6] The inventor of the Akins Accelerator challenged ATF's classification decision of the Akins Accelerator as a machinegun in the United States District Court for the Middle District of Florida, claiming that ATF's decision was arbitrary and capricious under the Administrative Procedure Act. *Akins* v. *United States,* No. 08-988, slip op. at 7–8 (M.D. Fla. Sept. 23, 2008), *aff'd*, 312 F. App'x 197 (11th Cir. 2009). The District Court rejected plaintiff's argument, finding that ATF demonstrated a "reasoned analysis" for its new interpretation and application, including the need to "protect the public from dangerous firearms." *Id.* at 6. The United States Court of Appeals for the Eleventh Circuit affirmed, holding that the "interpretation by [ATF] of the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Akins v. United States*, 312 Fed. Appx. at 200.

decisions. *See generally id.* ATF ultimately determined that its past classifications and conclusions "did not reflect the best interpretation of 'machinegun' under the NFA and GCA," and that the "[d]ecisions issued during that time did not include extensive legal analysis relating to the definition of 'machinegun.'" *Id.* at 66,514. Accordingly, ATF promulgated what is now the Final Rule to "bring clarity to the definition of 'machinegun'—specifically with respect to the terms 'automatically' and 'single function of the trigger,' as those terms are used to define 'machinegun.'" *Id.*

First, and consistent with its position since 2006, ATF formally defined the phrase "single function of the trigger" to mean "a single pull of the trigger and analogous motions." *E.g.*, 27 C.F.R. § 447.11; *see* Final Rule at 66,518. Next, ATF interpreted the modifying term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger," which reflects the ordinary meaning of that term when Congress enacted the NFA in 1934. *E.g.*, 27 C.F.R. § 447.11; *see* Final Rule at 66,519. Finally, ATF clarified that the definition of "machinegun":

> includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

*E.g.*, 27 C.F.R. § 447.11; *see* Final Rule at 66,515, 66,519. Upon publication of the Final Rule, these three amended definitions were incorporated into ATF's regulations at 27 C.F.R. §§ 447.11, 478.11, and 447.11. These definitions allowed ATF to further the underlying policy goals of the NFA and GCA, key statutes through which Congress sought to increase public safety after it had "determined that machineguns were a public safety threat." *See, e.g.*, Final Rule at 66,529. Thus, in promulgating the Final Rule, ATF sought to fulfill the Congressional goal of increased public safety by ensuring that all "devices that satisfy the statutory definition of 'machinegun' [are classified] as machineguns." *Id.* at 66,529, 66,537 ("This rule is a significant regulatory action that clarifies the meaning of the statutory definition of machinegun and reflects the public safety goals of the NFA and GCA.").

ATF began its efforts to fulfill its understanding of the NFA and GCA's public safety goals in connection with bump stocks in its NOPR, where it explained how "the Las Vegas tragedy made 'individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious.'" *Id.* at 66,520, 66,528 (quoting NOPR at 13,447). ATF expanded upon that concern in the Final Rule, acknowledging how the "ban also could result in less danger to first responders when responding to incidents, because it prevents shooters from using devices that allow them to shoot semiautomatic firearms automatically." *Id.* at 66,551. ATF echoed this concern throughout the Final Rule by repeatedly acknowledging how the revised definitions and effect of the Final Rule "reflects the public safety goals of those statutes." *See, e.g., id.* at 66,520, 66,522, 66,529.

## II.   Discussion

Plaintiffs claim they were deprived of ownership and all economic value of their property when they disposed of their bump stocks pursuant to the Final Rule, and that the effect of the Final Rule resulted in a Fifth Amendment Taking. Pls.' Resp. at 1–2. For the reasons set forth below, the Court finds that the Final Rule's mandate to surrender or destroy bump stocks does not satisfy the public use requirement under a Fifth Amendment Takings analysis, and that ATF appropriately acted within the confines of the police power.

### A.   Standard of Review

The Court will dismiss a case under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Spectre Corp. v. United States*, 132 Fed. Cl. 626, 628 (2017) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). In reviewing a motion to dismiss for failure to state a claim, the Court "must accept as true all the factual allegations in the complaint . . . and [] must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). The Court need not, however, accept legal conclusions "cast in the form of factual allegations," and will grant a motion to dismiss when faced with conclusory allegations that lack supporting facts, as "a formulaic recitation of the elements of a cause of action" alone will not withstand a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Akins*, 82 Fed. Cl. at 622.

This Court will grant a motion to dismiss when a plaintiff's Fifth Amendment Takings claim fails to assert "the kind of property right that could be the subject of a taking claim," or when the government validly exercises its limited authority under the police power doctrine. *Mitchell Arms v. United States*, 7 F.3d 212, 213 (Fed. Cir. 1993); *Akins*, 82 Fed. Cl. at 623. Thus, in order to prevail on a motion to dismiss in the context of a takings claim, a plaintiff must demonstrate it has a protected property interest, and, separately, that said property interest was taken for a "public use" and was not seized or retained pursuant to a valid exercise of the government's police power. Property taken by the government for private use, for example redistribution to other private persons, does not escape the Fifth Amendment's protections, though injunctive rather than compensatory relief might be the remedy. *Carole Media LLC v. N.J. Transit Co.*, 550 F.3d 302, 308 (3d Cir. 2008) ("A plaintiff that proves that a government entity has taken its property for a private, not a public, use is entitled to an injunction against the unconstitutional taking, not simply compensation.").

### B.   Fifth Amendment Takings Claims

The Takings Clause of the Fifth Amendment of the Constitution provides: "[N]or shall private property be taken for public use without just compensation." U.S. Const. amend. V. When alleging a takings claim, a plaintiff "must demonstrate that they have a property interest to assert and that the government physically or by regulation infringed on that interest for public use." *Craig Patty & Craig Thomas Expeditors, LLC v. United States*, 136 Fed. Cl. 211, 214 (2018). Thus, to bring a successful takings claim, the plaintiff must satisfy both the public use

7

and protected property interest requirements under the Fifth Amendment. *Amerisource Corp. v. United States*, 525 F.3d 1149, 1152 (Fed. Cir. 2008); *see Mitchell Arms*, 7 F.3d at 215, 217.

It is a well-established principle that, when a plaintiff alleges a physical taking, the "nature of the [government's] action is critical in [a] takings analysis." *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). Indeed, the Supreme Court has long-held that a "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887). That principle exists in large part because the "government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 414 (1922).

Courts have construed the text of the Takings Clause to mean that only those whose property has been "taken for a public use" are entitled to compensation. *Amerisource Corp.*, 525 F.3d at 1152; *Akins*, 82 Fed. Cl. at 622. Though the Takings Clause itself does not specify the exact grounds of public use "that trigger the just compensation requirement," the courts have consistently found that property is not taken for a "public use" when seized or retained pursuant to the police power. *Amerisource Corp.*, 525 F.3d at 1153; *Acadia Tech., Inc. v. United States*, 65 Fed. Cl. 425, 429 (2005) ("[I]f [property] is taken to prevent public harm, the government action may be an exercise of police power." (emphasis in original)), *aff'd Acadia Technology, Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006); *see also Tate v. District of Columbia*, 601 F.Supp.2d 132 (D.D.C. 2009). Moreover, "[t]he exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law." *Mugler v. Kansas*, 123 U.S. at 668–69.

When properly exercised, the police power provides the government with the authority, under limited circumstances, to take or require the destruction of property without compensation, as the Takings Clause is not implicated in such limited circumstances. *See, e.g.*, *id.*; *see also Craig Patty*, 136 Fed. Cl. at 213–14 ("The Supreme Court has long taught that the Takings Clause is not implicated when the government exercises its police power."); *Akins*, 82 Fed. Cl. at 622–23 (finding that ATF's requirement that owners of the Akins Accelerator remove and surrender the recoil springs without compensation was a valid exercise of the police power). Indeed, this Court's predecessor, the Court of Claims, explained that "where the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the fifth amendment is not required." *Radioptics, Inc. v. United States*, 223 Ct. Cl. 594 (1980); *see also Allied-Gen. Nuclear Servs. v. United States*, 839 F.2d 1572, 1576 (Fed. Cir. 1988) (reaching the same conclusion).

The Federal Circuit and this Court have found valid exercises of the police power where the government seized property to enforce criminal laws, and where the seized property "was evidence in an investigation or the object of the law enforcement action." *Amerisource Corp.*, 525 F.3d at 1153–54 (holding the government validly exercised its police power when it seized

pharmaceuticals without compensation in order to enforce criminal laws, suggesting that such seizure was another "classic example of the government's exercise of the police power to condemn contraband or noxious goods."); *see Craig Patty*, 136 Fed. Cl. 211 at 214–15; *see also, e.g.*, *AmeriSource Corp.*, 75 Fed. Cl. at 744. In those instances, the Court upheld such exercises of the police power because, as this Court has explained, the property was not seized "as a convenience to the government . . . ." *Craig Patty*, 136 Fed. Cl. at 214–15.

Finally, Congress has consistently regulated ownership of machineguns since 1934. To require compensation in circumstances such as these would effectively "compel the government to regulate by purchase." *See Andrus v. Allard*, 444 U.S. 51, 54 (1979) (emphasis omitted). Though the Court is highly receptive to plaintiffs' fairness arguments, the Court must acknowledge that the "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *See id.* (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. at 413).

As explained above, Congress bestowed upon ATF the authority "to investigate and enforce criminal and regulatory violations of Federal firearms law," including the power to prescribe rules and regulations necessary to carry out the provisions of 18 U.S.C. §§ 921 *et seq.* Def.'s MTD at 5 (citing 18 U.S.C. § 926(a), 26 U.S.C. §§ 7801(a)(2)(A), 7805(a), 28 U.S.C. § 599A(b)(1), 28 C.F.R. § 0.130(a)(1)–(2)). Acting pursuant to this authority when promulgating the Final Rule, it is clear that ATF intended to further "the public safety goals of the NFA and GCA" by clarifying that the definition of "machinegun" includes "bump-stock-type device[s]," and by requiring the surrender or destruction of bump stocks within ninety days of publication of the Final Rule. *See* Final Rule at 66,529, 66,537 ("This rule is a significant regulatory action that clarifies the meaning of the statutory definition of machinegun and reflects the public safety goals of the NFA and GCA."). As the purpose of promulgating the Final Rule was to promote public safety and to prevent public harm, the Court must conclude that ATF acted within the narrow confines of the police power when it required the surrender or destruction of all bump stocks. Accordingly, the Court grants defendant's Motion to Dismiss.

### III.     Conclusion

For the foregoing reasons, defendant's Motion to Dismiss is hereby **GRANTED**. Plaintiffs' takings claims are accordingly **DISMISSED** pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The Clerk is directed to enter judgment consistent with this opinion and order. No costs.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge