# In the United States Court of Federal Claims

Nos. 19-449; 25-425 (consolidated)
Filed: March 23, 2026

|  |  |
|---|---|
| THE MODERN SPORTSMAN, LLC, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| SLIDE FIRE SOLUTIONS, LP, et al., | ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |
| SLIDE FIRE SOLUTIONS, LP, et al., | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

*Adam Michael Riley*, Flint Law Firm, Edwardsville, Illinois, for plaintiff The Modern Sportsman, LLC.

*Mark Fernlund Hearne, II*, True North Law LLC, St. Louis, Missouri, for plaintiffs RW Arms, Ltd., Mark Maxwell, and Michael Stewart.

*Scott Ryan Riddle*, Riddle PLLC, Dallas, Texas, for plaintiff-intervenors Slide Fire Solutions, LP and Jeremiah Cottle.

*Nathanael Brown Yale*, United States Department of Justice, Civil Division, Washington, D.C., for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

Today, the Court addresses the cross-motions for summary judgment filed by plaintiffs RW Arms, Ltd., Mark Maxwell, and Michael Stewart (collectively, "RW Arms") and plaintiff-intervenors Slide Fire Solutions, LP ("Slide Fire") and Jeremiah Cottle. *See* ECF Nos. 92, 93. This case relates to the 2019 ban on bump stocks and its invalidation in *Garland v. Cargill*, 602 U.S. 406 (2024). In March 2019, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") destroyed approximately 73,000 bump stocks possessed by RW Arms. RW Arms filed suit and sought just compensation for their value. An ensuing title dispute arose as Slide Fire and Cottle intervened to claim ownership of the bump stocks. For the foregoing reasons, the Court **GRANTS** plaintiff-intervenors Slide Fire and Jeremiah Cottle's motion for partial summary judgment and **DENIES** plaintiff RW Arms' motion for summary judgment.

## I.    Background

### A.  Slide Fire Shuts Down

The Court provided a more extensive history of the case in a prior opinion, familiarity with which is assumed. *See Modern Sportsman LLC v. United States* ("*Modern Sportsman III*"), 176 Fed. Cl. 567, 575 (2025). This opinion provides a recount of the facts relevant to resolving the current dispute over title to the bump stocks.

On October 1, 2017, a gunman opened fire on a crowd in Las Vegas, Nevada, using semi-automatic rifles upgraded with bump stocks. Bump stocks replace the standard stocks on rifles, which enable users to fire their weapons more rapidly. Pl.'s Mot. for Summary Judgment, ECF No. 92-1 at 3 [hereinafter "RW Arms Mot."]. The shooting prompted public scrutiny and political debate regarding bump stocks legality, much of which was directed at Jeremiah Cottle. *Id.*

Jeremiah Cottle invented bump stocks and founded Slide Fire, which manufactures and sells them. *Id.* at 3–4. After the Las Vegas shooting, Cottle received death threats and became concerned about his safety and that of his family. *Id.* at 4.

Around March 2018, the United States Department of Justice announced it would reclassify bump stocks as machine guns and ban them under the National Firearms Act of 1934 ("NFA"). *Id.* This news combined with the threats on Cottle, led him to wind down Slide Fire's operations and move to Tennessee. *Id.* at 4–5. By May 2018, Slide Fire shut down its website, ceased taking orders, and gave up its federal firearms license. *Id.*

### B.  Operations of RW Arms

As Slide Fire shutdown, then-employees Mark Maxwell and Michael Stewart approached Cottle with a proposal to start their own retail firearms business. *Id.* Their business, RW Arms, would market and sell Slide Fire's remaining inventory of bump stocks until the ban took effect. *Id.* Slide Fire would transfer its bump stock inventory to RW Arms and split the proceeds from each sale evenly. *Id.* This handshake agreement was never reduced to writing. *Id.*; Pl.-Intervenor's Mot. for Partial Summary Judgement, ECF No. 93, at 2 [hereinafter "Slide Fire Mot."].

Once Slide Fire ceased sales, RW Arms stored and sold the bump stocks from its Fort Worth, Texas warehouse and remitted fifty percent of the proceeds to Slide Fire and Cottle as agreed. RW Arms Mot. at 5–6. Initially, the checks were addressed to Slide Fire but eventually were sent to Cottle individually. *Id.* at 6.

### C. Bump Stock Destruction

On December 26, 2018, the ATF published its Final Rule ("the Rule") *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018). In effect, the Rule retroactively redefined bump stocks as machine guns under the NFA and the Gun Control Act. RW Arms Mot. at 9. The Rule imposed a national ban on the sale, possession, and transfer of bumps stocks, and required owners to surrender or destroy such devices by March 26, 2019. *Id.*

Soon after, the ATF visited RW Arms's Fort Worth warehouse to inspect its inventory of bump stocks and discovered that destroying them would require an industrial shredder. *Id.* Maxwell contacted American Shredder to destroy the stocks and hired a third party to film the destruction. *Id.*

On March 26, 2019, RW Arms transported the stocks to American Shredder for destruction. *Id.* at 10. Cottle attended the destruction, along with personnel from the ATF and Stewart and Maxwell. *Id.* at 11; Slide Fire's Mot. at 14. The ATF signed invoices on RW Arms letterhead for the destroyed stocks. RW Arms Mot. at 11. RW Arms also paid the $7,000 invoice from American Shredder but subtracted $3,500 from the next payment to Cottle. *Id.* at 10; Pl. Intervenor's Response to Mot. Sum. J., ECF No. 97, at 11 [hereinafter "Slide Fire Resp."].

### D. The Litigation Agreement between Slide Fire and RW Arms

Around this time, Maxwell, Stewart, and Cottle met to discuss whether to the destruction constituted a compensable taking under the Fifth Amendment of the United States Constitution. RW Arms Mot. at 12. Cottle would not join the potential lawsuit, but the parties would split any recovery fifty-fifty. *Id.* This agreement was reduced to writing. *Id.*; Slide Fire Resp. at 12–13. Following the discussions, RW Arms filed suit in this Court and Stewart appraised Cottle as their case progressed. RW Arms Mot. at 13. When the Rule was invalidated in *Cargill*, Cottle considered reopening Slide Fire. *Id.*

## II.    Procedural History

The Modern Sportsman, LLC ("Modern Sportsman"), the original plaintiff in this matter, filed its complaint on March 26, 2019. Pl. Compl., ECF No. 1. In its initial option, the Court concluded that ATF properly exercised its police powers when it enacted the Rule and dismissed the case. *See Modern Sportsman, LLC v. United States* ("*Modern Sportsman I*"), 145 Fed. Cl. 575, 583 (2019), *aff'd* 2021 WL 4486419 (Fed. Cir. 2021). Specifically, the Court found that the "Final Rule's mandate to surrender or destroy bump stocks does not satisfy the public use requirement under a Fifth Amendment Takings analysis, and that ATF appropriately acted within the confines of the police power." *Id.* at 580–81. However, the Supreme Court in a related matter invalidated the Rule and overturned the bump stock ban in June 2024. *Cargill*, 602 U.S. 406 (2024).

After *Cargill*, Modern Sportsman filed a motion for relief from judgment of the original dismissal and request for leave to file an amended complaint which the Court granted. Order Granting Pl. Mot. for Relief from J., ECF No. 30.

RW Arms, Stewart, and Maxwell then filed their second amended complaint, asserting takings and illegal exaction claims. *See* Pl.'s Second Amended Compl., ECF No. 31 at ¶¶ 36–64. RW Arms claimed it "legally purchased and owned" the bump stocks destroyed by the ATF. *See id.* at ¶ 14.[1] In December 2024, Slide Fire and Cottle intervened to resolve who owned the 73,000 bump stocks RW Arms claimed to own to protect their intellectual property rights and present their claims for just compensation. Mot. To Intervene, ECF No. 38 at 1–2. Plaintiffs' illegal extraction claims were later dismissed. *Modern Sportsman III*, 176 Fed. Cl. at 569.

On September 25, 2025, the parties filed their motions for summary judgment. RW Arms argues that it is the rightful owner of the destroyed bump stocks, and it is entitled to any just compensation awarded. *See* RW Arms Mot. at 23. In response, Slide Fire and Cottle seek (1) recognition that they held title to the bump stocks and any just-compensation recovered be paid to them, (2) that RW Arms had no title or compensable ownership interest in the bump stocks, and (3) if the Court denies their motion, that it enter findings of fact under Rules of the United States Court of Federal Claims ("RCFC") 56(g) that: (a) there was no evidence of a sale contract, (b) the parties had a fifty-fifty split of proceeds and Slide Fire controlled price and promotions, and (c) RW Arms had no obligation to purchase unsold bump stocks. Slide Fire Mot. at 35–36. On October 6, 2025, Slide Fire and RW Arms filed their responses. *See* ECF Nos. 97, 98.

### III.    Standard of Review

Summary judgment is appropriate when the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *Seal-Flex, Inc. v. Athletic Track and Court Const.*, 98 F.3d 1318, 1321 (Fed. Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Only disputes over material facts, or facts that may significantly affect the outcome of the suit can preclude summary judgment. *Anderson*, 477 U.S. at 248. A dispute over a material fact is genuine if the evidence would allow a reasonable jury to return a verdict in favor of the non-moving party. *Id.*

The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Id.* at 256; *see also Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). All significant doubt over factual issues must be resolved in favor of the non-moving party. *Mingus Constructors,* 812 F.2d at 1390. The non-moving party has the burden of establishing that there is indeed a genuine dispute of material fact. *Id*. at 1390-91 ("the party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient"). In evaluating motions for summary judgment, the Court must consider each party's motions on its own merits and draw all reasonable inferences against the party whose motion is under consideration. *Id*. at 1391.

---

[1]    In its first amended complaint, RW Arms claimed it only had a property interest in the destroyed bump stocks, but did not claim ownership. *See* First Amended Compl., ECF No. 4, at ¶ 15.

## IV.    Discussion

RW Arms contends the transfer of the bump stocks was a sale.  It asserts that it received title when it took possession of the bump stocks even though it only purchased the stocks as they were sold.  *See* RW Arms Mot. at 8.  RW Arms claims it assumed responsibility for storing, pricing, and shipping the bump stocks, employing others to assist with retail operations, and interacting with the media, all of which evince ownership.  *Id.* at 6.  Maxwell and Stewart also argue that they did not need to consult with anyone before making sales and that all the proceeds were sent to RW Arms' operating account, where they commingled with the proceeds from sales of other products.  *Id.* at 7.  Additionally, Cottle and Slide Fire never requested records or an accounting, and did not track, inspect, audit, or manage the bump stocks.  *Id.*  In fact, the stocks transferred from Slide Fire were commingled with other inventory, including the bump stocks RW Arms had purchased from other retailers, which they assert is further evidence of a sale.  *Id.*

In opposition, Cottle claims that RW Arms never possessed title to the bump stocks. Instead, title transferred directly from Slide Fire to a customer in accordance a consignment.  Slide Fire Mot. at 5.  Cottle alleged that Slide Fire maintained a "watchful eye" over RW Arms's bump stock operations, set prices at Slide Fire's manufacturer's suggested retail price ("MSRP"), and directed sales and promotions.  Slide Fire Mot. at 6–7; Slide Fire Resp. at 22.

Upon careful review, the Court holds that the transfer was a consignment and title remained with Slide Fire and Cottle.

### A. Texas Law Determines Title.

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers jurisdiction upon this Court to hear just compensation claims under the Takings Clause.  *Murray v. United States*, 817 F.2d 1580, 1582–83 (Fed. Cir. 1987).  Only persons with a "valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  The Fifth Amendment protects but does not create property interests; instead "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law define the dimensions of the requisite property rights for the purposes of establishing a cognizable taking. *Air Pegasus of D.C. v. United States*, 424 F.3d 1208, 1213 (Fed. Cir. 2005) (internal quotations omitted).  The Court must often "make independent factual determinations of claimants' specific property interests as a matter of course in adjudicating these claims." *Mannatt v. United States*, 48 Fed. Cl. 148, 152 (2000).  Those determinations "often turn questions as to the meaning of state or federal statutes or regulations." *Del Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998).

The Court agrees with the parties that Texas law applies in this dispute.  *See Presault v. United States*, 100 F.3d 1525, 1535 (Fed. Cir. 1996) (en banc) (finding Vermont law controlled where a railroad's acquisition of a right-of-way fell "under well-established Vermont laws and procedures.").  As Texas corporations, Slide Fire and RW Arms formed and performed their agreement in Texas, and the bump stocks were stored, sold, and destroyed in Texas.  *See* RW Mot.

at 15; Slide Fire Mot. at 20.  The Court now looks to Texas law to determine whether the transfer of the bump stocks was a sale or a consignment.[2]

### B.  The Transaction was a Consignment and Title Stayed with Slide Fire.

RW Arms argues that the transfer of the bump stocks was a sale because (1) there were no indicia of a consignment; (2) RW Arms had title because it possessed the physical stocks at the time of destruction; and (3) Slide Fire cannot claim it maintained title because it did not file a UCC Article 9 security interest.  *See generally* RW Arms Mot.

Slide Fire and Cottle argue (1) that the transfer was always intended as a consignment; (2) the Statute of Frauds precludes finding that a contract for sale existed; and (3) this was a true consignment, not a 'sale or return' or 'sale on approval.'  *See* Slide Fire Mot.  The Court concludes Slide Fire transferred the bump stocks to RW Arms on consignment and that Slide Fire held title when the stocks were destroyed.

### i.    Consignments and Sales

A consignment is a transaction "regardless of its form, in which a person delivers goods to a merchant for the purpose of sale" and "does not create a security interest that secures an obligation."  *See* TEX. BUS. & COMM. CODE ANN. [hereinafter "TBCC"] § 9.102(a)(20)(D).  In other words, a consignment allows a party to "give merchandise or the like to another to sell, usually with the understanding that the seller will pay the owner for the goods with the proceeds." *Armendariz v. Hudgens*, 618 S.W.3d 750, 765 (Tex. App.–El Paso 2020) (cleaned up) (quoting *Consign*, *Black's Law Dictionary* (10th ed. 2014)).  Consignments are bailments, where title does not pass to the consignee.  *See Armendariz*, 618 S.W.3d at 764–65 (citing *Fuller v. Tex. W. Fin. Corp.* (*Fuller I*), 635 S.W.2d 787, 789 (Tex. Civ. App.–Tyler 1982) and 1 Am. Jur. 2d *Proof of Facts* § 253 (1974)).

On the other hand, a 'sale' is the "passing of title from the seller to the buyer for a price." TBCC § 2.106(a).  A sale, "in its most basic terms, includes the following elements: (1) the thing sold, which is the object of the contract; (2) the consideration or price to be paid for the thing sold; and (3) the consent of the parties to exchange the thing for a price."  *John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 20 (Tex. App.–Hou. 2000).  *See also* TBCC § 2.106(a) (a contract for sale includes "both a present sale of goods and a contract to sell goods in the future.").

The "prime distinguishing factor" of a consignment from a sale is that in a consignment, after the goods have been delivered to the dealer, "no obligation arises on the part of the dealer to pay for them."  *Fowler v. Penn. Tire Co.*, 326 F.2d 526, 532 (5th Cir. 1964) (citing *Edgewood Shoe Factories, Div. of Gen. Shoe Corp. v. Stewart*, 107 F.2d 123, 125 (5th Cir. 1939)) (affirming an Eastern District of Texas decision that an unambiguous contract which retained title in the consignor was not a contract for sale and title did not pass to consignee).  Parties must contract for

---

[2]    Texas adopted the Uniform Commercial Code ("UCC") as the Texas Business and Commercial Code ("TBCC").  The chapters of the TBCC align with the articles of the UCC.  The Court follows Texas case law in referencing the UCC Article designation in discussion.  *See e.g., Armendariz v. Hudgens*, 618 S.W.3d 750, 765 (Tex. App.–El Paso 2020) and *Wallace v. Harper*, 1998 WL 201723 at *4 (Tex. App.– S.A., Apr. 22, 1998).

sale to acquire title; mere possession is insufficient. *See Edgewood Shoe*, 107 F.2d at 125 (reversing a Middle District of Alabama decision, holding a contract which did not contain an agreement for the consignee to either buy the shoes or return them was still a consignment contract and physical possession of the shoes did not pass title to consignee). *See also Shinsho Am. Corp. v. HyQuality Alloys, LLC*, 694 F. Supp. 3d 805, 815–19 (S.D. Tex. 2023) (holding the title to steel bar passed from Shinsho to HQA because it was delivered under the sales agreement instead of the consignment agreement, not because it was merely in HQA's possession).

### ii.      Where a Transaction is Ambiguous, Look to the Intent of the Parties.

RW Arms asserts that no consignment agreement exists in the record—Cottle's intent was always as a sale and title transferred with possession. *See* RW Arms Mot. at 15–19. Further, RW Arms operated as if it owned the stocks, by comingling both funds from the bump stock sales with proceeds from other products and the bump stocks received from Slide Fire with bump stocks purchased from other dealers. *Id.* at 7. Further, it avers the Court should find a sale because Cottle exercised no control over the sales and made no arrangement for the return of the stocks. *See id.* at 20. RW Arms claims that the Slide Fire's lack of a bookkeeper to "[keep] account of … sales and payment" by RW Arms indicates a sale over a consignment. *Ludvigh v. Am. Woolen Co.*, 231 U.S. 522, 526 (1913).

For its part, Slide Fire argued that it never intended to sell the bump stocks, and the parties intended the transfer as a consignment. *See* Slide Fire Resp. at 4. In addition, RW Arms failed to demonstrate that Cottle intended to transfer title with the bump stocks, including because he was involved both with RW Arms after it received the stocks, and in the destruction process. *Id.* at 23.

Conduct by both parties may be used to show a consignment agreement. *Abraham & Co., Inc. v. Mansour Rahmanan & Co., Inc.*, 1998 WL 93743, at *4 (Tex. App.–Houston, Mar. 5, 1998); s*ee also Edgewood Shoe*, 107 F.2d at 126 (in ambiguous transactions look to the parties to determine if they are buyer and seller or consignor and consignee). Especially in case where there is no writing, courts must determine from "*any agreements* between the parties whether a 'sale or return' was intended or whether the parties unequivoca[lly] 'otherwise agreed' to create a consignment." *Abraham*, 1998 WL 93743, at *4 (quoting *Fuller v. Tex. W. Fin. Corp. ("Fuller II")*, 644 S.W.2d 442, 443 (Tex. 1982)).[3] The *Abraham* court considered four factors in finding an oral agreement was sale, not a consignment: (1) invoices for payment within thirty days; (2) periodic payments by purchaser without reference to any specific item; (3) purchaser failed to account to seller for each item sold; and (4) purchaser treated the [items] at issue as part of his own inventory. 1998 WL 93743 at *3. *See also Ludvigh*, 231 U.S. at 527 (holding the requirement of the dealer to pay the sender for the goods sold after they were sold an important factor in a consignment).

Considering the conduct of Slide Fire and RW Arms, transferring the bump stocks constituted a consignment, not a sale. First, Stewart admitted that Cottle never intended to sell the bump stocks to RW Arms and RW Arms never intended to purchase them. *See* Slide Fire Ex. 1,

---

[3]      "Sales or Return" and "Sales on Approval" are UCC Article 2 sales distinguished out of consignment transactions when Texas adopted the UCC. *Collier v. B & B Parts Sales, Inc.*, 471 S.W.2d 151, 153–54 (Tex. App.–Tyler 1971). They are discussed in detail below.

ECF No. 93-1, Deposition of Michael Stewart at 77:14–24 [hereinafter "Stewart Deposition"]. According to Stewart, RW Arms could not afford to pay for the bump stocks outright, it "purchased" the stocks as it sold them to end users. *Id.* at 21:10–23:4; 83:17–23. Since payment to Slide Fire was not due within a set time of delivery, the first factor under *Abraham* weighs in favor of consignment. 1998 WL 93743 at *3. *See also Fowler*, 326 F.2d at 532. Additionally, Slide Fire's checks referenced that month's bump stock sales based on RW Arms's own recordkeeping. *See* RW Arms Ex. 7, ECF No. 92-8, Checks Paid to Slide Fire and Cottle. Maxwell and Stewart's decision to account for sales and ensure Slide Fire and Cottle received their proper share of the proceeds weighs against finding a sale under the second and third factors in *Abraham*. *See* Slide Fire Ex. 2, ECF No. 93-2, Deposition of Mark Maxwell at 31:11–20 [hereinafter "Maxwell Deposition"]. Though Stewart and Maxwell both considered the bump stocks as RW Arms' own inventory, which could support a sale under *Abraham*'s fourth factor, the court there held that the "whether the receiver believed title passed" was not dispositive in determining a sale or consignment. 1998 WL 93743 at *3. Since three out of four *Abraham* factors weigh in favor of a consignment, the Court cannot find a sale contract.

Next, representations by Maxwell and Stewart contradict RW Arms' claims that Cottle was not involved with the bump stock sales after they were transferred. *See* RW Arms Mot. at 18, 20. Maxwell acknowledged that RW Arms was founded on Slide Fire's inventory and claimed it was operated "under Jeremiah's watchful eye." Maxwell Deposition at 34:8–21. Further, RW Arms used Slide Fire's MSRP to price the bump stocks at Cottle's direction, and Cottle would direct sales promotions and partnerships. Stewart Deposition at 39:1–17; Maxwell Deposition at 35:9–36:11. In consignments, the "supplier retains control over the manner of selling sufficient to render the recipient his agent." *Armendariz*, 618 S.W.3d at 765 (quoting 1 Am. Jur. 2d *Proof of Facts* § 253 (1974)). Cottle also claimed that he relied on Maxwell and Stewart to act in good faith and thus did not request audits of RW Arms's sales. RW Arms Ex. 5, ECF No. 92-6, Slide Fire and Jeremiah Cottle's Objections and Responses at ¶ 9 [hereinafter "Cottle Responses"].

RW Arms further contends that Cottle played a minimal role during the destruction of the stocks. On destruction day, Cottle allegedly arrived once half the stocks had been destroyed and was more concerned about whether he could keep his prototypes. RW Arms Mot. at 11. In addition, Stewart testified that he alone coordinated and destroyed the bump stocks with ATF and that RW Arms bore the entire $7,000 cost. *See* RW Arms Ex. 6, Stewart Declaration at ¶¶ 15–16. Not so. Cottle communicated with ATF officials beforehand and ATF confirmed that Cottle was their point person on the destruction. *See* Slide Fire Ex. 5, ECF No. 93-5, Call Between Jeremiah Cottle and Blake Gordon, ATF at 8:1–6 [hereinafter "Cottle–Gordon Call"]; RW Arms Resp., Ex. 11, Declaration of Sherry Perales, ATF, ¶ 4. Cottle also bore half the cost when RW Arms withheld $3,500 from his final check. Stewart Deposition at 168:17–169:22. The level of Cottle's involvement on destruction day is not indicative of his overall involvement post-transfer. Everyone present was observing American Shredder destroy the stocks.

RW Arms argues Cottle's alleged failure to write off the destroyed bump stocks as an involuntary conversion of property undermines his claim of title. *See* RW Arms Mot. at 13–14. Slide Fire asserts Cottle's recordkeeping is consistent with his ownership claim. Slide Fire Mot. at 12. This is irrelevant, tax returns do not determine passage of title, a sales contract does. *See* TBCC § 2.106(a). Nonetheless, Cottle asked the ATF for receipts for his taxes because he intended to write off the destroyed stocks, even if they did not appear on his or Slide Fire's 2019 tax return.

*See* Cottle–Gordon Call at 8:1–6; RW Arms Ex. 12, ECF No. 98-12, Slide Fire 2019 Tax Return. RW Arms, for its part, cannot locate its tax returns from 2018–2020 and therefore cannot show that it wrote off the bump stocks as lost property. *See* Slide Fire Ex. 8, RW Arms Response to Discovery, ECF No. 93-8, Response to Request for Production ¶ 9.

Finally, RW Arms contends that Cottle never arranged to take back ownership of unsold bump stocks weighs in favor of a sale. This argument is unpersuasive. Bump stocks transferred to RW Arms would either be sold or destroyed by the ATF under the Rule. Even then, although RW Arms claims return rights were never discussed, Stewart testified that if Cottle demanded RW Arms return the bump stocks, Stewart and Maxwell would have complied and "all three of us would have went back to work." Stewart Deposition at 53:10–57:14.

The Court finds the parties' conduct shows the bump stocks were transferred to RW Arms on consignment.

### iii.    The Term 'Consignment' is not Necessary to Create a Consignment.

Next, RW Arms asserts that no consignment agreement was created because Cottle never used the term "consignment" when the bump stocks were transferred. *See* RW Arms Mot. at 16. It argues that a written agreement which uses the term 'consign' is important in determining the intent of the parties. *See Charles M. Stieff, Inc. v. City of San Antonio*, 111 S.W.2d 1086, 1090 (Tex. 1938).

RW Arms again fails to convince the Court it should fashion a sale out of a consignment. Courts look to the substance of an agreement when determining if a consignment was created, not whether the parties explicitly used the term. *See Armendariz*, 618 S.W. at 764–65. Furthermore, *Stieff* does not provide much instruction because the parties did not memorialize their agreement in writing. 111 S.W.2d at 1090. A court can find a consignment without a written contract. *Abraham*, 1998 WL 93743 at *4 (quoting *Fuller II*, 644 S.W.2d at 443).

Courts must determine if the parties intended a "sale or return" or "unequivocal[lly] 'otherwise agreed' to create a consignment." *Fuller II*, 644 S.W.2d at 443 (upholding *Fuller I*, that a transaction was a sale or return, not a consignment, because the recipient was required to pay for the goods upon receipt, but unsold goods could be returned. 635 S.W.2d at 790). And while Texas law "presupposes a contract for sale is contemplated between the parties although that contract may be of peculiar character here described," no contract for sale is contemplated where a one party is not a "buyer," and the object is not for "resale." *Employers Cas. Co.*, 609 S.W.2d 579, 587 (Tex. Civ. App.–Dallas 1980) (quoting TBCC § 2.236 cmt. 1 (Vernon 1968)).

Here, RW Arms "bought" each bump stock as it was sold, meaning they did not purchase them from Slide Fire when they were transferred, and thus were not for resale. *See* Stewart Deposition at 77:14–24. That Stewart was unfamiliar with the concept of a consignment does not transform the transaction into a sale. *See id.* at 37:4–6, 49:2–50:25. Title does not pass, and a sale is not made, just because the receiver believes so. *See Abraham*, 1998 WL 93743 at * 3. Finally, although the parties believe that consignments usually favor the consignee much more than the operative agreement, Cottle and Slide Fire's generous fifty-fifty split with RW Arms does not defeat a consignment. *See* RW Arms Ex. 1, ECF No. 92-2, Declaration of Jeremiah Cottle at ¶ 25.

9

RW Arms cites to no authority that consignments must favor the manufacturer or otherwise are sales.

### iv.     The Statute of Frauds Defeats a Sale.

Slide Fire raises the Statute of Frauds as another defense to a sales contract because the transfer agreement was never written.  Slide Fire Mot. at 25.  RW Arms claims that the litigation agreement was a continuation of the handshake deal.  RW Arms Mot. at 12.  Cottle claims that RW Arm's right to fifty percent of the litigation was premised on RW Arms' status as a retailer with lost opportunity and was not a retroactive written confirmation of the bump stock transfer agreement after sales concluded and the stocks were destroyed.  Slide Fire Resp., at 13.

Under Texas law, any contract for the sale of goods worth $500 or more is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  TBCC § 2.201(a).  As an exception to the Statute of Frauds, contracts that fail to satisfy the requirements are nonetheless enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted."  § 2.201(c)(3).

Slide Fire and RW Arms' agreement does not pass muster under the Statute of Frauds.  The parties never memorialized their agreement in writing.  RW Arms Mot. at 1.  Further, the parties' agreement does not fall under any exception to the Statute of Frauds.  RW Arms did not pay Slide Fire and Cottle until it sold the bump stocks. Although the stocks had been received and accepted by RW Arms, both Cottle and Stewart claim no sale was contemplated.  They had a handshake deal to transfer the stocks and split proceeds from the sales.

In opposition, RW Arms argues that a consignment agreement requires a writing to be valid. *See id.* at 16–17.  In effect, RW Arms suggests that the Statute of Frauds applies to consignments and therefore serves as a defense to formation.  Incorrect.  A consignment is "merely an agency and is not within article 2 of the [TBCC]," and thus outside the Statute of Frauds.  *Wallace v. Harper*, 1998 WL 201723 at *4 (Tex. App.–S.A., Apr. 22, 1998).  *See also Abraham*, 1998 WL 93743 at *4.

### v.     No Sale on Return or Sale on Approval.

When Texas adopted the UCC, some transactions considered consignments were reclassified as "sales or returns," or as "sales on approval."  *Collier v. B & B Auto Parts Sales, Inc.*, 471 S.W.2d 151, 153–54 (Tex. Civ. App.–Tyler 1971).  Both are distinct from consignments and often arise with respect to the rights of secured creditors.  TBCC § 2.326 cmt. 4.  A "sale or return" is a "sale to a merchant whose unwillingness to buy is overcome by the seller's engagement to take back the goods (or any commercial unit of goods) in lieu of payment if they fail to be resold."  *Id.* at cmt. 1.  A "sale on approval" is a contract in which "goods are delivered to the proposed purchaser but remain property of the seller until the buyer accepts them."  *Id.*

With the expansion of "sales or returns" and "sales on approval," the intention of the parties was "no longer determinative of the question of whether a transaction was a sale or consignment." *Collier*, 471 S.W.2d at 154.  In these cases, parties' intent "concerning passage of title is to be disregarded only with respect to the rights of creditors."  *Employers Cas. Co.*, 609 S.W.2d at 588

(changing the rule in *Fowler*, 326 F.2d 526, only with respect to creditors, Article 2 still controls between buyer and seller).

RW Arms argues that *Fuller II* should apply, and the Court should find a conditional "sale or return" or "sale on approval" under TBCC § 2.236(a) because the parties did not "unequivocal[lly] agree" to a consignment. *See* RW Arms Mot. at 2. RW Arms misstates the law; when the consignment agreement is not "unequivocal," *Fuller II* directs courts to look to § 2.236 to determine a "sale or return" or "sale on approval," not a true sale under § 2.201. 644 S.W.2d at 443. Slide Fire argues that this was a true consignment, and there was no "sale on return" or "sale on approval" under § 2.236. *See* Slide Fire Mot. at 27. The Court agrees with Slide Fire.

RW Arms' theory falls flat. It was not an unwilling buyer; it was not a buyer at all but was very willing to take the bump stocks. And despite not being buyers, there is no dispute that RW Arms stored and sold the bump stocks until the ATF destroyed them. Therefore, the Court does not find the transaction was a 'sale or return' or a 'sale on approval;' but an "unequivoca[l]" consignment. *Fuller II*, 644 S.W.2d at 443. And because no creditor interest is alleged, *Collier*'s title analysis does not apply.

### vi.      Possession Does Not Provide Title.

RW Arms further claims that because it had physical possession, it held title. RW Arms Mot. at 18.[4] This theory typically arises under disputes to grants and adverse possession of real property. *See Lewis v. City of San Antonio*, 7 Tex. 288, 298 (1851) (discussing that with the possession of land comes the presumption of a grant under the common law). The argument fails to persuade because it would destroy the distinction between a sale and consignment. *See* TBCC § 2.106. Title for goods passes with a sale. *Armendariz*, 618 S.W.3d at 764–65; *Fowler*, 326 F.2d at 532. RW Arms possessed the bump stocks only as a bailment, title remained with Slide Fire.

### vii.      Article 9 Does Not Apply.

RW Arms' next claims that the lack of a written security agreement defeats a consignment. *See* RW Arms Mot. at 18–19. Not so. UCC Article 9 governs the rights of third-party creditors as to goods in possession of the consignee. *See Fuller II*, 644 S.W.2d at 443 (Tex. 1982); *Brashear v. D Cross B, Inc.*, 711 S.W.2d 749, 751–52 (Tex. App.–Ft. Wor. 1986); TBCC § 9.319. Consignment agreements are not governed by the UCC, "the relationship between consignor and consignee is left to other law." § 9.109 cmt. 6.

As the Court previously held, the transaction between Slide Fire and RW Arms was a true consignment. Slide Fire transferred the bump stocks to RW Arms as a bailment for the latter to sell, and the parties would split the proceeds. *Armendariz*, 618 S.W.3d at 764–65. Slide Fire does not claim any security interest on the bump stocks and thus made no filings under Article 9.

---

[4]      Specifically, RW Arms argues "[p]ossession is nine points in the law," Lord Mansfield, *Corp. of Kingston upon Hull v. Horner* (1774) 98 Eng. Rep. 807, 815 (KB) (holding a grant of title to land is presumed, when the city operated a port for 350 years, preceding a royal charter), and further raises a play, COLLEY CIBBER, WOMEN' WIT act I (1697) ("[p]ossession is eleven points in the law."). RW Arms Mot. at 18 at n.3. Horner was limited to land grants, as discussed in *Lewis*, 7 Tex. at 298 (citing *Mayor of Kingston upon Hull v. Horner* (1774) 98 Eng. Rep. 989, 992 (KB) (same as *Corp. of Kingston upon Hull*)).

Furthermore, Slide Fire is not a third-party creditor and no independent third-party is claiming a security interest from RW Arms.  Therefore, Article 9 does not apply.

## V.    Conclusion

For the foregoing reasons, Slide Fire's Motion for Partial Summary Judgment, ECF No. 93 is **GRANTED**, RW Arms's Motion for Summary Judgment, ECF No. 92, is **DENIED**, and Count I of RW Arms' Second Amended Complaint, ECF No. 31, is **DISMISSED** as to the bump stocks transferred to RW Arms by Slide Fire.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge

12